# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN DOE MC- 2,

              Plaintiff,

vs.

THE UNIVERSITY OF MICHIGAN,
THE REGENTS OF THE UNIVERSITY
OF MICHIGAN (official capacity only),

           Jointly and Severally,

           Defendants.

Case No. 2:20-cv-10578

Hon. Victoria A. Roberts

Magistrate Judge Elizabeth A. Stafford

---

Michael A. Cox (P43039)
Jackie J. Cook (P68781)
**THE MIKE COX LAW FIRM, PLLC**
Attorneys for Plaintiff
17430 Laurel Park Dr. N., Ste. 120E
Livonia, MI 48152
734.591.4002
mc@mikecoxlaw.com

David J. Shea (P41399)
Ashley D. Shea (P82471)
**SHEA LAW FIRM PLLC**
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
248.354.0224
david.shea@sadplaw.com

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

    NOW COMES Plaintiff, John Doe MC-2, by and through his attorneys,

Michael A. Cox, Jackie Cook and The Mike Cox Law Firm, PLLC, as well as David

1

J. Shea, Ashley D. Shea and Shea Law Firm PLLC, and for his Complaint against The University of Michigan ("UM") and the Regents of the University of Michigan ("Regents"), collectively referred to as "Defendants," states as follows:

## I.   <u>INTRODUCTION</u>

1.      While employed as a physician by UM from the early 1960s until 2003, Dr. Robert Anderson ("Anderson" or "Dr. Anderson") used his position to sexually assault university students, many of whom were athletes.

2.      As early as 1968, and on information and belief even earlier, UM received complaints from male students about Anderson sexually assaulting them during putative medical examinations.

3.      As early as 1969, and on information and belief even earlier, UM received complaints from male student-athletes about Anderson sexually assaulting them during putative medical examinations.

4.      In 1979, UM initially fired Anderson from his position as University Health Services ("UHS") Director after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, an allegation Anderson did not deny.

5.      However, UM overrode the decision to terminate Anderson, and allowed Anderson to stay  at UHS as a "senior physician" where he continued to see and sexually assault male students and/or student-athletes before moving Anderson

to the position of full-time Athletic Department physician in 1981, where predictably Anderson continued sexually assaulting male student athletes, most of whom were attending UM on athletic scholarships, or with grants-in-aid, or as members of various sports teams, including among others, football, wrestling, hockey, gymnastics, basketball, baseball, cheerleading, and track and cross country teams, until he retired in 2003.

6.      To UM, the Athletic Department became the perfect place to hide Anderson's past, present, and future sexual abuse of young men from public disclosure. Student-athletes were a vulnerable population because they often attended college only as a result of UM's grant of a full or partial athletic scholarship requiring them to play sports under the intense microscope of an esteemed Big 10 athletic department which urged them always to conduct themselves, above all else, as "Michigan Men".  The fact Anderson was given free rein to abuse hundreds – perhaps thousands – of male student-athletes with impunity was, in the end, a calculated risk worth taking by Defendants for the greater good of UM.

7.      UM managed to keep its knowledge of Anderson's sexually predatory acts protected from public disclosure, and more importantly, disclosure to UM students and student athletes, through a calculated campaign of artifice and continued misrepresentations, with both affirmative and omissive acts and misstatements to, among others, the public, the UM university community,

unknowing and unwitting coaches and trainers, and students and student athletes to fraudulently conceal Anderson's predatory acts in an intentional and deliberately indifferent manner.

8.     While a UM undergraduate student, Plaintiff participated on an athletic team.

9.     Plaintiff was required by the UM Athletic Department's leadership, who used Plaintiff's coaches and trainers as witting and unwitting agents, to see only Anderson for medical care while participating on a UM sports team, and Anderson sexually assaulted, abused, and molested Plaintiff under the guise of medical treatment.

10.     UM is responsible for Plaintiff's damages stemming from Anderson's sexual assaults on UM's campus, as UM placed vulnerable student athletes like Plaintiff in Anderson's care despite knowing he was a sexual predator.

11.     This is a civil action against UM for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Defendants in their official capacity, and their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Anderson against Plaintiff while a UM student.

12.     Plaintiff files this case anonymously because of the extremely sensitive

4

nature of the case as Plaintiff was a victim of sexual assault, and the suit will require

disclosure of information "of the utmost intimacy"; Plaintiff is therefore entitled to

protect his identity in this public filing by not disclosing his name. *Doe v. Porter*,

370 F.3d 558, 560 (6th Cir., 2004), citing *Doe v. Stegall,* 653 F.2d 180, 185–86 (5th

Cir., 1981).   See also, Case 2:20-cv-10568-VAR-EAS ECF No. 73 filed 07/09/20.

John Doe MC-2's name and his Identifying Information including dates of

attendance at UM has been provided to the Defendants pursuant to ¶ 10 of ECF No.

73, "Protective Order".

## II.   **JURISDICTION AND VENUE**

13.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331

because this is a civil action arising from the Constitution, laws and treaties of the

United States, including but not limited to, Title IX of the Educational Amendments

of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United

States Constitution pursuant to 42 U.S.C. § 1983.

14.   This Court has original subject matter jurisdiction under 28 U.S.C. §

1343 because this is a civil action authorized by law brought by a person to redress

the deprivation, under color of a State Law, statute, ordinance, regulation, custom or

usage, of a right, privilege or immunity secured by the Constitution of the United

States or by an Act of Congress providing for equal rights of citizens or of all persons

within the jurisdiction of the United States, and a civil action to recover damages or

to secure equitable relief under an Act of Congress providing for the protection of civil rights.

15.    The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq.*, and under Michigan Law.

16.    The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

17.    The acts and events giving rise to this lawsuit occurred in Washtenaw County, Michigan which sits in the Southern Division of the Eastern District of Michigan.

18.    Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), because the acts and events giving rise to the claims occurred in this judicial district.

19.    Plaintiff's Complaint is timely filed within the applicable statutes of limitations.

## III.   <u>PARTIES</u>

20.    Plaintiff is a resident of the State of Michigan.

21.    UM is a public university organized and existing under the laws of the State of Michigan.

22.    UM receives federal financial assistance and is therefore, among other reasons, subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §

6

1681(a).

23.     The Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

24.     Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., or any other statute.

## IV.    COMMON FACTUAL ALLEGATIONS

25.     From the early 1960s until 2003, Anderson was a physician employed by UM treating students on UM's Ann Arbor campus, during which time UM gave Anderson unfettered access to young college students, including young male athletes.

26.     It was sometime soon after beginning employment with UM that, according to Ambassador Ron Weiser, the current chair of the UM Regents, Anderson sexually abused Ambassador Weiser while Weiser was a freshman wrestler at UM in 1963.

27.     In a March 2020 Detroit News article, Weiser reported he was a "survivor" who had been "abused" by Dr. Anderson and urged other survivors like the Plaintiff to tell their stories.

28.     In the same article, Weiser shared that he could not recall how many times he saw Anderson for medical care because he continued seeing Anderson until,

7

at least, 1967 when Weiser was a graduate student. "Finley: UM regent, donor Ron Weiser says he was molested by doctor, too", The Detroit News, 03/12/2020.

29.     This is because, as he told Nolan Finley in an accompanying video interview, Weiser did not consider it (Anderson's acts during the medical examinations of Weiser) sexual assault when it happened.

30.     And it is clear that Mr. Weiser did not understand or consider Anderson's acts committed while Weiser sought medical treatment as "sexual assault" because he continued seeing Anderson even after he stopped wrestling, and even after he graduated with his bachelor's degree. And so, on information and belief, he did not speak out until now as he now knows that he is a "survivor" and that Anderson was committing sexually abusive acts on him in the guise of medical treatment.

31.     Further, on information and belief, it is clear that Weiser would have spoken out earlier if he had known facts about Anderson and the UM that were uncovered by a recent non-public investigation by Detective Mark West of the UM Public Safety and Security Department. This is so because Weiser has been a leader at the UM for well over 4 decades, serving in the 1980s and 1990s on the UM's President's Advisory Board and the UM's Center for Community Service; the iconic Weiser Hall on the Ann Arbor Campus is name for him, as is the Weiser Center for Emerging Democracies in the College of LSA, the Weiser Diplomacy Center in the

Gerald R. Ford School for Public Policy, the Weiser Center for Real Estate in the Ross Business School, the Weiser Food Allergy Center at UM's Mott's Children's Hospital, and the Weiser Center Club at the Crisler Arena; and Weiser is currently both a chair of Victors For Michigan to increase Michigan's endowment and the endowment fund for the UM Hospital system.  In these capacities Weiser has been intricately involved with leaders from every part of the UM, from athletics to academics to administration, for decades.

32.    UM appointed Anderson on or about September 1, 1966 as the Clinical Instructor in Internal Medicine and Clinical Instructor in Surgery, Medical School and the Senior Physician of UHS.

33.    On or about October 1, 1968, UM promoted Anderson to UHS Director, and Anderson continued as the Athletic Department's primary care physician and team physician for many of UM's athletic teams.

**In 1968, an undergraduate student filed a written complaint about Anderson's sexually predatory acts.  UM affirmatively chose to not investigate.**

34.    During the 1968-1969 school year, a gay UM student, Gary Bailey, went for an examination with Anderson, an examination that Bailey later described to the Detroit News as "very traumatic."

35.    Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals."  Bailey further states, "Back then you did not question a doctor's

9

authority…He asked me to pull on his penis."

36.     Bailey filed a written complaint with the UM's University Health Services ("UHS") complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

37.     No one from UHS or any other UM agency followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

38.     UM was deliberately indifferent and chose to ignore this gay student's report of a criminal sexual assault by a high-ranking UM official – a medical doctor – and, as a direct consequence, prevented any university or public inquiry (and resultant discovery) of Dr. Anderson's acts.

39.     This choice to not act allowed Anderson to escape investigation, and affirmatively misled Anderson's future patients, particularly young male students, into believing Anderson was an ethical and competent doctor who followed the well-known medical ethic of "First, Do No Harm".

40.     This choice to not investigate during the 1968/1969 school year also, more specifically, (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled (or who were subjected to some other sexual act) by Anderson before 1968 from discovering those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of

Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

41.     This choice to not investigate or punish Anderson for his sexually predatory conduct is one early example of UM's (and/or its senior management's) conspiracy to protect itself and Dr. Anderson, its UHS Director, and engage in affirmative acts to avoid investigation of complaints against Anderson and UM, and so prevent subsequent discovery of Anderson's acts by the public or plaintiffs, and place unsuspecting male students at heightened risk for sexual assault by Anderson.

## In 1969, a scholarship gymnast complained to Coach Newt Loken about Anderson's digital anal assault. UM affirmatively chose to not investigate.

42.     In 1969, former University of Oklahoma and Washington State gymnastics coach Ward Black saw Anderson for a physical examination for the first time as a freshman scholarship gymnast at UM.

43.     During this 1969 physical, Anderson digitally penetrated Mr. Black's anus.

44.     Afterward, Mr. Black expressed his concern about this act to his UM gymnastics coach, Newt Loken, by stating words to the effect of "what was up with Dr. A?".

45.     In response, Coach Loken merely patted Mr. Black on the knee, smiled

11

a "wry Cheshire grin", and changed the subject.

46.     Based on that reaction, Mr. Black "knew he knew. We all knew he knew" and did not complain again.

47.     Coach Loken was a NCAA gymnastics champion, coached 2 national championship teams at Michigan, authored an U.S. Navy physical conditioning manual during World War II, possessed a doctorate in education, and served as a kinesiology professor at UM for over 20 years.

48.     This deliberately indifferent choice to ignore Black's complaint by Coach Loken -- an agent of both the Athletic Department and UM - - who as a coach and kinesiology professor knew that proper athletic physical examinations of young men do not include digital anal penetrations -- allowed Anderson to escape investigation and likely discovery in 1969, and so (a) prevented the discovery by students and student athletes who were digitally penetrated by Anderson before 1969 that Anderson's digital penetrations were not medically necessary, and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

49.     Coach Loken's deliberate indifference to reports of abuse by Anderson

led to the creation of and indifference to a sexually hostile environment, placing

unsuspecting student athletes at a heightened risk for sexual assault by Anderson.

50.     Coach Loken continued to coach the gymnastics team until 1983 and

remained affiliated with the gymnastics program and Athletic Department until, at

least, 2007, some four years after Dr. Anderson retired, and the current UM

gymnastics facility is named after him.

**In 1973, an undergraduate tennis athlete told a UM-employed therapist about another sexual assault by Dr. Anderson.   UM affirmatively chose to not investigate.**

51.     In 1973, a freshwoman tennis athlete named Cathy Kalahar saw Dr.

Anderson for a routine athletic physical examination.

52.     During that examination, among other things, Anderson digitally

penetrated Ms. Kalahar's vagina and engaged in inappropriate sexual fondling.

53.     Some months later Ms. Kalahar sought counseling with a UM-

employed therapist and told the therapist about Dr. Anderson's acts.  The therapist

accused Ms. Kalahar of engaging in sexual fantasy.

54.     This statement by UM's employee and agent demonstrates the

affirmative policy of UM to avoid investigating any complaints about Dr. Anderson,

and instead, when receiving complaints, to affirmatively rebuke or rebuff,  or just

plain ignore, the reporting student to prevent further inquiry and allow Dr.

Anderson's sexual abuse of students to escape investigation and public discovery.

55.     This statement by the UM therapist is similar to the statement by Coach Loken as it allowed Anderson to escape investigation and likely discovery in 1973, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1973 from discovering, as a result of an investigation, that those acts were not medically necessary, but instead were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, therapists, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

56.     Further, this statement by the UM therapist is yet another example of UM's deliberate indifference to and creation of a sexually hostile environment in the Athletic Department and UHS, placing unsuspecting student athletes at a heightened risk for sexual assault by Anderson.

**In 1975, an undergraduate wrestler told his coach and Athletic Director Don Canham about more sexual assaults by Anderson.  UM affirmatively chose to not investigate.**

57.     UM's head wrestling coach in mid-1970s, Bill Johannesen, recently admitted that he knew back in the 1970s that whenever one of his wrestlers went to see Dr. Anderson they had to "drop their drawers", even if the injury was to the wrestler's elbow.

14

58.    In 1975, UM student and scholarship member of UM's wrestling team, Tad Deluca, outlined sexual assaults by Anderson in a 10-page letter to Coach Johannesen, complaining, among other things, that "(s)omething was wrong with Dr. Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough.'" (emphasis added).

59.    Showing their deliberate indifference, neither UM, Coach Johannesen, nor any agents of UM investigated Deluca's complaints about Anderson's sexual assaults; instead, Coach Johannesen chose to take away Deluca's athletic scholarship and kicked him off the wrestling team.

60.    Deluca appealed to then Athletic Director Don Canham and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham direct notice of Anderson's sexual assaults of Deluca.

61.    While a reasonable person would expect that a major university athletic director, after receiving serious complaints about possible sex abuse from a scholarship athlete, would at a minimum investigate, Director Canham did not. Instead, after reading Deluca's letter regarding Anderson, Canham showed extreme deliberate indifference in choosing not to investigate the sexual abuse complaints against Anderson; and so Canham callously chose to uphold the revocation of Deluca's athletic scholarship.

62.    This decision by the powerful and legendary Athletic Director Don

15

Canham (who has a building named after him on campus) was another affirmative act to avoid investigating complaints against Dr. Anderson such that it allowed Anderson to escape investigation and likely discovery in 1975, despite Tad Deluca's detailed allegations, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1975 from discovering that  those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

63.    Coach Johannesen's and Director Canham's responses and deliberate indifference to Deluca's report of abuse led to the creation of a sexually hostile environment in the Athletic Department, placing unsuspecting student athletes at a heightened risk for sexual assault by Anderson.

64.    Deluca had to hire an attorney to appeal to UM's Board of Intercollegiate Athletics which overruled the decisions of Coach Johannesen and Athletic Director to punish Deluca, in part, for reporting Anderson's misconduct, and decided to reinstate Deluca's scholarship.

16

**In 1976, an undergraduate track athlete reported more sexual assaults by Anderson to his coaches and they laughed at the athlete.  UM affirmatively chose to not investigate.**

65.     Plaintiff John Doe MC-16, who filed a similar complaint against UM in Case 2:20-cv-10622-VAR-EAS in the Eastern District on March 8, 2020, attended UM in the 1970s on a track athletic scholarship.

66.     Anderson repeatedly groped John Doe MC-16's penis and testicles (and digitally penetrated his anus once) during approximately 25 visits to Anderson for a variety of illnesses and injuries.

67.     After one of those visits in 1976, John Doe MC-16 approached both his head coach, Jack Harvey, and assistant coach, Ron Warhurst, and told them that Anderson was touching and groping his penis and testicles during Anderson's medical examinations.

68.     Anderson had already digitally penetrated John Doe MC-16's anus at the time John Doe MC-16 told coaches Harvey and Warhurst about the genital groping, but John Doe MC-16 was too embarrassed to tell his coaches about the penetration.

69.     After reporting Anderson's conduct to Coach Harvey and Coach Warhurst, John Doe MC-16 further asked to go to another physician so he could get medical assistance for his injury(s).

70.     Both Coach Harvey and Coach Warhurst laughed at John Doe MC-16,

17

ignored his complaint, and refused to send him to a different physician.

71.     These laughing rebukes by Harvey and Warhurst to a victim reporting Dr. Anderson's misconduct not only dissuaded other potential reporters but also allowed Anderson to escape investigation and likely discovery in 1976, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1976 from discovering those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

72.     It was this type of deliberate indifference and acceptance and promotion of Anderson's acts by coaches that also normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in UM athletics.

73.     This is even more so where the prior year Athletic Director Canham's deliberate indifference to Tad DeLuca's complaint about Anderson *de facto* normalized and enshrined Anderson's acts within the Athletic Department (as it had the Athletic Director's imprimatur) as simply "department policy" or protocol for the medical treatment of all athletes.

74.     Harvey's and Warhurst's deliberate indifference to John Doe MC-16's report of abuse by Dr. Anderson further contributed to the creation of a sexually hostile environment in the Athletic Department, placing unsuspecting student athletes at a heightened risk for sexual assault by Anderson.

75.     During this same period in the mid-1970s, numerous track athletes called Anderson "pants down doctor."

**In September of 1976, a different UM runner told Head Cross Country Coach Ron Warhurst that Anderson sexually abused that runner and Warhurst replied "deal with it fucker".  UM affirmatively chose to not investigate.**

76.     John Doe WL-28, Case No. 2:20-cv-12038-BAF-RSW, ECF No. 1, filed 07/30/20, PageID.28, was a student athlete on the track and cross-country teams from 1976 to 1981.

77.     In September of 1976 "John Doe WL-28 was present when U of M Coach Warhurst [Ron Warhurst was then the Head Cross Country Coach and Assistant Track Coach] discussed and joked with him and other student-athletes about the sexual abuse being committed by Dr. Anderson during routine medical examinations."

78.     When John Doe WL-28 interjected to tell Coach Warhurst that Anderson had sexually abused him (John Doe WL-28), Warhurst responded, "deal with it fucker."

79.     At various other times during John Doe WL-28's career between 1976

19

and 1981, Warhurst told John Doe WL-28 "in essence that 'So you have a sore throat, you have to go to Anderson, drop your drawers, and get your hernia checked'" and then Warhurst would laugh about that abuse.

80.    Warhurst's rebuke to John Doe WL-28, a victim reporting Dr. Anderson's sexual assaults, in front of other athletes, not only dissuaded other potential reporters but also allowed Anderson to escape investigation and likely discovery in 1976, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1976 from discovering those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

81.    In the same way, Warhurst's casual and callous comments throughout John Doe WL-28's career from 1976 to 1981, about sore throat complaints leading to criminal genital groping by Dr. Anderson, demonstrated not only deliberate indifference by him and his employer, UM, but also conscious choices by him and others at UM to not investigate Anderson or report his sexual misconduct, such that it (a) prevented the discovery by students and student athletes who were digitally

20

penetrated or fondled by Anderson before 1981 from discovering those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, coaches and trainers, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**In 1979, a graduate student reported more sexual assaults by Anderson to a UHS administrator.  UM affirmatively chose to not investigate.**

82.    According to records of the Washtenaw County Prosecutor's Office, in 1979, a then-graduate student at the UM (whose identity is known by the Washtenaw County Prosecutor's Office and UM) was seen by Anderson at the UHS when Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable…he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

83.    This graduate student complained loudly to the desk clerk, and then to a UHS administrator, both of whom "dismissed" him and ordered a security guard to escort him out of UHS - - instead of investigating his allegation against Anderson.

84.    The affirmative choice by that UHS administrator to not follow up on that graduate student's loud complaint of the digital anal penetration and genital groping sexual assaults by Dr. Anderson allowed Anderson to escape investigation and likely discovery in 1979, and so (a) prevented the discovery by students and

21

student athletes who were digitally penetrated or fondled by Anderson before 1979 from discovering, after an investigation of graduate student's complaint, that those acts were not medically necessary, but rather were sexual assaults and (b) hindered future student and student athlete victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

85.     The desk clerk's and UHS administrators' deliberate indifference to the graduate student's complaints of abuse by Dr. Anderson led to the creation of a sexually hostile environment at UM, and by extension in the Athletic Department, placing unsuspecting student athletes at a heightened risk for sexual assault by Anderson.

**In 1979, a local activist from the gay community told Thomas Easthope, the-then Associate Vice President of Student Services, that Anderson had assaulted many gay students and so Thomas Easthope "fired" Dr. Anderson for these sexually predatory acts.**

86.     After the Detroit News uncovered the current UM administration's coverup of Dr. Anderson's decades-long sexual abuse of UM students and student athletes on February 19, 2020, counsel obtained publicly available Freedom of Information Act ("FOIA") materials regarding a 2018-2019 investigation of Dr. Anderson's predatory conduct by the UM Division of Public Safety and Security

Detective Mark West.

87.     When questioned in 2018, Thomas "Tom" Easthope told Detective

West that a local activist who was "familiar with the homosexual community, and

people talked to him as they trusted him to help" told Easthope that Anderson had

assaulted several members of the gay community at UM.

88.     Easthope, who as Associate Vice President of Student Life (also called

the Office of Student Services) had supervisory oversight of the UHS, minimized

Anderson's sexual abuse by describing  Anderson's actions as "fooling around with

boys in the exam room."

89.     As told by Easthope to Detective West in the FOIA documents,

Easthope stated he decided to terminate Anderson, but was nervous because

Anderson was "big shot" at UM.

90.     Easthope reported to Detective West that he confronted Anderson about

knowing Anderson abused several people that were in the gay community and that

he was "fooling around in the exam rooms" with male students.

91.     Easthope reported that when confronted with these allegations,

Anderson "did not deny" the accusations.

92.     Easthope told West that he told Anderson, "You gotta go."

93.     Easthope then told Detective West that after initially firing Anderson,

Easthope decided to allow Anderson to resign to avoid an employee termination

fight which would delay Anderson leaving his job, and presumably, the UM.

94.    During this time, Easthope was an agent and senior executive at UM, and the direct supervisor of Anderson.

95.    According to Detective West, Easthope also claimed he thought Anderson left campus in 1980, even though Anderson was a prominent part of the nationally known Michigan football team for the next two decades until 2003.

96.    When Easthope was confronted by Detective West in 2018 with the information that Anderson never left campus, Easthope proclaimed "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

97.    This statement demonstrates Easthope's knowledge of the continuing and ever-present threat that Dr. Anderson posed to UM's students; yet Easthope, through his deliberate indifference, chose to not publicize the firing and the reason for firing Anderson so others who had been victimized by Dr. Anderson in the course of medical treatment would not realize Anderson's putative medical acts were actually sexual assaults, and could not otherwise discover their claims.

98.    This statement by Easthope to Detective West also demonstrates that, besides not ensuring a fired employee actually left UM's employment, Easthope chose to not do any investigation of who was assaulted, how they were assaulted, or to determine how many were abused, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before

1979 from discovering, after an investigation of the gays students' complaints, that

those acts were not medically necessary, but rather were sexual assaults and (b)

hindered future student and student athlete victims of Anderson from acquiring the

information that (i) Anderson engaged in medically unnecessary acts to commit

sexual assault and (ii) UM, though its most senior administrators, employed a false

artifice and misrepresentation that Dr. Anderson was an ethical and competent

doctor.

**On or about August 13, 1979, or sometime shortly before that date, one of the**
**two, or very few, executives higher in rank than Mr. Easthope apparently**
**changed Easthope's termination of Anderson to a simple demotion.**

99.     According to UM's personnel records for Anderson, before Easthope's

"firing" of Anderson, UM apparently viewed Anderson as exemplary physician and

Director of UHS because Anderson had received 7 "merit increases" in his salary

between 1971 and August 13, 1979.

100.    These merit increases had been approved by various top executives at

UM including Thomas Easthope, as Associate Vice President of Student Services;

Henry Johnson, as Vice President of Student Services; Harold Shapiro, in his

capacity as Vice President of Student Affairs (he later assumed the Presidency of

UM in late 1979); and Allan Smith, in his capacity as Interim President of the UM.

101.    Indeed, in a letter dated August 13, 1979, Allan F. Smith, the Interim

President of UM at the time, notified Dr. Anderson that once again Anderson would

receive a "merit salary increase".

102.   On information and belief, it was on that very date or shortly before that date that Easthope "fired" Anderson because, according to UM's personnel records, Anderson was demoted on that same date of August 13, 1979 from his position as Director of UHS to the position of "Senior Physician", to be effective on January 14, 1980.

103.   The UM forms demoting Anderson are signed by Mr. Easthope.

104.   Thus, according to the UM paperwork and Easthope's interview with Detective West, Easthope's termination of Anderson was overridden by one of Easthope's two superior officers, either his boss Henry Johnson, Vice President of Student Services or Mr. Johnson's superior (either Allan F. Smith, the Interim President or incoming President Harold Shapiro).

105.   Indeed, despite telling Detective West that he had fired Anderson, Easthope signed another pay increase for the then "Senior Physician" Anderson on June 27, 1980, some 8 to 9 months after Easthope "fired" Anderson.

106.   The effect of the demotion, instead of a termination, was to leave Anderson in a capacity where he could continue to abuse students at the UHS and student athletes in his capacity as a team physician at the Athletic Department.

**At the end of the 1979/1980 school year, UM's President affirmatively misled the then-UM community, public, and past and future students and potential victims, with false statements about Anderson's status at UHS in the 1979-1980 President's Annual Report to create an artifice and avoid diligent inquiry or discovery of Anderson's predatory conduct**.

107.   In his 1979/1980 school year "yearbook", UM President Shapiro overtly and fraudulently concealed the reason for the Anderson's departure from the position of Director of UHS, by outright lying that Anderson chose to "resign" when in fact, Anderson was initially fired, then reinstated with a demotion.

108.   Indeed, the President went beyond a simple lie, and instead, extravagantly praised Anderson in the published Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980.

109.   More specifically, the UM and President Shapiro lied in this publication by telling the public and past, current, and future students: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

110.   In a separate note in the same publication, Henry Johnson, the Vice

27

President of Student Services, one of the most powerful persons at UM for two decades and the right-hand lieutenant for a series of UM presidents, wrote separately to also praise Anderson's "leadership" and proclaimed "we are pleased that he plans to remain on (the UHS) staff."

111.   UM outright lied when it described Anderson's departure as voluntary and lauded his "leadership" when UM and its executives knew that (a) Easthope fired or demoted Anderson for his sexual assaults on male students, and (b) Anderson's termination  was changed to a written demotion in his personnel file, through the separate or joint efforts of Athletic Director Canham or Vice President Johnson or other "V.P.s" or President Shapiro, so Anderson could stay at the UHS and also continue to act as a team physician in the Athletic Department.

112.   After UM "demoted" the "big shot" Anderson to continue to work at the UHS and at the Athletic Department, UM provided Anderson unfettered access to hundreds of male students and male scholarship athletes (as well as non-scholarship male athletes) - -  many from middle or working class families who could not afford to attend UM without an athletic scholarship, and were trained to unquestioningly endure physical and emotional discomfort without complaining in order to compete in their sport.

113.   The demotion gave Anderson free reign to abuse hundreds of male athletes like Plaintiff with impunity.

114. After his firing/demotion for sexually abusing students on campus, Anderson was represented and regarded as "the" medical authority of the athletic department, including for the football team, for decades by authority figures in the UM athletic department, including its athletic director, Don Canham.

## Mr. Easthope's confidential deposition testimony given on July 28, 2020 and August 4, 2020.

115. On July 28, 2020 and August 4, 2020, Thomas Easthope, the former Associate Vice President for Student Services, and direct supervisor of Dr. Robert Anderson, provided the following testimony under oath:

a.   Easthope was the Associate Vice President of Student Services and his supervisor was Henry Johnson, Vice President of Student Services.

b.   His boss, Henry Johnson, reported directly to the President of the UM. [Tr. p. 29:17-19].

c.   Easthope acted as "COO" of Student Services, while Johnson acted as "CEO" of Student Services. [Tr. P. 30:5-10]. In this position Easthope also had access to and the "ear" of UM presidents such as President Robben Fleming, for whom UM's administration building is named. ["President Fleming relied on me a great deal to communicate with students." Tr. p. 37:9-10].

d.   In this capacity Easthope supervised approximately 1600 UM employees. [Tr. p. 31:11-17].

e.   Mr. Easthope had no disciplinary or other issues with Dr. Anderson before Jim Toy (an employee of Easthope and the gay male advocate at UM's Human Sexuality Office) reported Anderson had sexually abused several gay students in the UHS exam rooms. [Tr. p. 50:1-3].

29

f.   Easthope was aware that Dr. Anderson worked with "the Athletic Department on something." [Tr. p. 53:4-7].

g.   Regarding Dr. Anderson's manner and demeanor, Easthope testified he was "authoritarian", [Tr. p. 51:17] and "Dr. Anderson was in a position of supreme authority and power" vis-à-vis UM students.  [Tr. p. 332:10-11].

h.   Easthope testified that he fired Dr. Anderson based on Jim Toy's report that Anderson was "fooling around with boys", that is, abusing gay students in the exam room of the UHS. Easthope reported that this event was "absolutely" "the worst employee incident" he had ever encountered in his professional career. [Tr. p. 57:19-22].  It was "something that, you know, just shocked the hell out of me." [Tr. p. 60:18-19].  "[I]t was a significant event in my life…it infuriated me." [Tr. p. 63:14-18].  And Anderson's acts violated UM's sexual harassment policy. [Tr. p. 65:14-17].

i.   Easthope recalled "I was furious walking across campus (to fire Anderson) …it was a very, very significant point in my life and my career and everything to confront somebody who was a doctor." [Tr. p. 64: 14-17].  Easthope described the firing of a physician, "somebody who has got this aura of being a physician and being the head of Health Services" as taking "some guts, as I recall." [Tr. p. 87: 3-6].

j.   Indeed, Dr. Anderson was Vice President Johnson's private doctor.  [Tr. p. 52:14-18].

k.   Anderson was the only division head (of Student Services) that Easthope had ever fired.  [Tr. p. 68:10-12].

l.   Yet Easthope does not recall preparing or producing any paperwork regarding the firing of Anderson. [Tr. p. 15-17].

m.   When confronted with the fact that Anderson stayed employed by UM after Easthope's firing of Anderson, Easthope agreed that whomever overrode his termination decision was wrong:   "I believe it would be wrong, yes…it was moral authority (to fire Anderson) so I gotta get rid of this guy." [Tr. pp. 88:25-89:3].

30

n.      Easthope testified that Mr. Johnson intervened for Anderson: "But if your boss intervened…what do you do" [Tr. p. 129:1-3]. And relayed "that's a difficult question to go against the vice president (Henry Johnson) about something he overrode me on, I guess." [Tr. p. 130:10-12].

o.      Easthope also suggested that Athletic Director Don Canham may have been involved in overriding Easthope's decision to fire Anderson, "Don Canham was a bigger man than Henry Johnson and probably 90 percent of the people on the hill." [Tr. p. 109:25-110:2]. Canham was "a voice to be reckoned with at the University of Michigan." [Tr. p. 336:6-7].

p.      But in any event, Easthope was "stunned, to be honest with you" that Anderson stayed after Easthope fired him. [Tr. p. 162:22-23].

q.      Easthope agreed it was predictable that if Anderson did not leave the UM campus after Easthope fired him on or around August 13, 1979, [Tr. pp. 117-122], that "you know based on his past performance…if he were allowed to stay, he would - - the numbers [of abused students] would go up." [Tr. p. 89:12-15].

r.      Yet Easthope never told anyone about Anderson's sexually predatory conduct even though he equated it to the conduct of Dr. Larry Nassar at Michigan State University: "(W)hen the Nassar thing came up…I think I may have said, you know, that we had to get rid of Bob Anderson because of that." [Tr. p. 215:10-14].

s.      For instance, Easthope never asked University Health Services to investigate the extent of Anderson's abuse, nor asked the Ann Arbor Police to investigate, nor the Washtenaw County Prosecutor's Office, nor "LARA" which is the "state licensing agency", nor did Easthope even inform either the UM Medical School or the UM Athletic Department about Anderson's sexual abuse of male students. [See generally, Tr. pp 219-220].

t.      Importantly, Easthope did not inform the Athletic Department

31

about Anderson's sexual abuse of male students or Anderson's "termination" despite knowing "that he [Anderson] was working with the athletic department on something, but that was out of my sphere of influence and nothing that I had any input about, so it wasn't something that I was terrible concerned about." [Tr. p. 53:4-8].

u.     Easthope testified he told his boss, Henry Johnson, a person who directly reported to the President of UM, about Jim Toy's information that Dr. Anderson had been abusing gay male students – "I didn't just go knocking off people without Henry knowing about it" [Tr. pp. 303:25-304:1]; "(B)ut I did tell him what I knew about what Jim Toy had told me", [Tr. p. 323:11-14]; and that Toy described "inappropriate actions with the gay population", [Tr. p. 324:25-325:1].

v.     Easthope repeatedly testified that he decided to fire Anderson because he "was abusing a vulnerable population," to Easthope, "that was horrible" [Tr. 62-63] and "tore [him] up." [Tr. 61]. "That doesn't go here." [Tr. p. 63:20-21.]

w.     When asked about his failure – despite the power of his position – to do more, Easthope testified, "We live in a different time, and it's not like that today.  To go out and make accusations about people, and 'this guy is against gays' or something wouldn't been very nice to anybody, including myself, so it is wasn't something you go out and broadcast.  I just didn't want to have to deal with that kind of problem."  [Tr. pp. 165:25-166:7.]

x.     Indeed, Easthope testified he had other priorities more important than ensuring Anderson left campus in order to protect future students from being abused by Anderson:  "So in retrospect, it doesn't sound very forgiving of me, but I had to move on, I had a lot of things going on every day, and you know, I suppose you experience having to make a decision and move on.  I can't explain it any other way."  [Tr. p. 186:18-23.]

y.     And finally, Easthope blamed "society" for the abuse of UM students, whether it was before or after August 13, 1979:  "Our society is complicit in that, our society allows certain people to

32

have dominion over other people and that's very difficult, you know.  If you were a young athlete and you wanted to perform, you didn't want to get yourself in trouble with anybody, and it's hard - - it would be hard to know that you got yourself in trouble because of some guy screwing around with you." [Tr. p. 171:1-10].  Easthope continued, "I can tell you how I would feel, but I'm not 100 athletes that had their scholarships on the line if they reported somebody who was revered by their coaches."  [Tr. p. 171:11-14]

116.   Mr. Easthope's affirmative acts to not ensure Anderson left campus or confront Mr. Johnson or Mr. Canham or Interim President Smith or President Shapiro, after one or some of them overrode Easthope's termination of Anderson, fraudulently concealed both the existence of a claim here – that the acts done in the guise of medical treatment were in fact sexual assaults --  as well as the identities of liable defendants – Anderson as the assaultive offender and UM as his aider-and-abettor – and so (a) prevented the discovery by all students and student athletes who were digitally penetrated or fondled by Anderson from ever discovering that those acts were not medically necessary, but rather were sexual assaults and (b) hindered all future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

117.   The decision of Mr. Johnson (and if involved, the decision of Athletic Director Canham or President Harold Shapiro) to reverse the firing of Dr. Anderson

affirmatively (a) prevented the discovery by all students and student athletes who were digitally penetrated or fondled by Anderson from ever discovering that those acts were not medically necessary, but rather were sexual assaults and (b) hindered all future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**Months after Easthope fired/demoted Anderson for preying on gay students in the exam room of the UHS, Anderson accosted gay undergraduate student Keith Moree in an exam room at the UHS.**

118.  On May 28, 1980, Keith Moree, a gay undergraduate student, saw Dr. Anderson at the UHS, eight months after the firing/demotion by Mr. Easthope of Dr. Anderson from his position as Director of University Health Services.

119.  Because Mr. Moree went to the UHS over a concern about a possible venereal disease, Moree told Dr. Anderson that he was gay.

120.  After Moree lowered his pants and underpants to prepare for Anderson's examination, Anderson stood face-to-face with Moree and then began an unprovoked monologue about the differences between circumcised and uncircumcised penises during masturbation.

121.  Anderson stated words to the effect of: "It is a shame that you are circumcised.  It feels really good when I (Anderson) am masturbating to have the

foreskin (on his uncircumcised penis) rub against the head of my (Anderson) penis."

122.  Mr. Moree soon realized that Anderson's arms and shoulders were moving up-and-down and it appeared that he was "playing with himself" as he described his masturbatory habits to Mr. Moree.  At the same time, Anderson's "breathing became heavy".

123.  Stunned and intimidated by this authority figure doing such an act during a confidential medical exam, Mr. Moree did not move while Anderson continued.

124.  Soon after this exam by Anderson, Mr. Moree mentioned the assault at the UHS to a gay student he knew.  This student stated, "It sounds like you saw Dr. Anderson.  Everyone knows about him.  He always cops a feel."

125.  Mr. Moree's shock over Anderson's examination led him to report Anderson's abuse to the UM-paid gay male advocate Jim Toy, who served as the coordinator of UM's Human Sexuality Office.

126.  Moree admired (and admires) Jim Toy very much as a pioneer for gay rights at the UM and in Michigan, and for whom a community center is named, and thus used him as his primary conduit in dealing with the UM regarding his complaint against Dr. Anderson.

127.  Jim Toy told Mr. Moree that Keith's experience was "very similar" to a prior  complaint or prior complaints about Anderson sexually assaulting a gay

male(s) student(s) at UHS, but that UM ended up doing nothing because it viewed it as a "he said, he said" situation when Anderson denied the prior assault.

128.   Sometime before January 7, 1981, Moree and Toy met with Toy's boss, Associate Vice President of Student Services Tom Easthope to talk about Anderson's assaultive conduct.

129.   After hearing Moree's retelling of Anderson's assault, Vice President Easthope told Mr. Moree and Mr. Toy that Easthope "was very sorry" and that he "needed to do an investigation and I will get back to you."

130.   Eventually, on January 7, 1981, Mr. Easthope met with Moree and Toy for a second time.  But immediately before the meeting with Easthope, Toy and Moree had a preliminary meeting with Dr. Anderson in Easthope's office.

131.   As part of that preliminary meeting, Anderson and UM forced Moree to sign the following agreement:

> I have voluntarily agreed that a tape recording be made of our conversation on January 7, 1981.
> I understand that ***no part of the contents of the tape will be released*** to any person other than the undersigned, ***without the written consent of all the persons undersigned***. (Emphases added).  **Exhibit 1.**

132.   After three each signed this "secrecy pact" – two 50-ish UM employees who reported to Mr. Easthope and the 20-year old undergraduate – Anderson apologized for his assault on Keith Moree the prior May 28th of 1980.

133.   Mr. Moree does not know what UM did with the secret tape recording

of this January 7, 1981 meeting where Dr. Anderson apologized.

134.   Anderson left the meeting and then Mr. Easthope met with Jim Toy and Keith Moree.

135.   At this second meeting Easthope told Moree, that "Dr. Anderson is troubled, sick, and needing help…he's very sorry for any distress or upset he caused you."

136.   Easthope continued with words to the effect of, "My first thought was to fire him.  But he has a family and kids".  Easthope also stated that if Anderson were fired then both he and his family would suffer financially.

137.   Easthope then offered the following proposal to resolve Mr. Moree's complaint:  "Would it be okay with you if Anderson is removed from his medical duties and moved to an administrative position where the University would keep him away from other students?"  Easthope further offered that Anderson "would not be able to treat patients in the University setting."

138.   From the context of Easthope's words, it was clear to Moree that Easthope wanted Moree to not publicly complain or seek any kind of claim against Anderson or UM, *if* Easthope would ensure that Anderson would not be able to treat any more student patients while Anderson was at UM.

139.   Mr. Easthope left the room to allow Mr. Toy and Moree the opportunity to talk it over.  While Moreee was disgusted by Anderson, he did not want to harm

Anderson's family, and thought it would be a "win" to remove Anderson from any further access or opportunity to treat university students.

140.   Mr. Moree verbally agreed to Easthope's proposal, and Easthope sealed the deal when he and Plaintiff "shook hands on that (agreement)."  Easthope told Mr. Moree "thank you for having the guts to come forward."

141.   Moree never thought to follow up on his agreement with Easthope because, in his mind, Easthope was a high-ranking UM official and there was no reason to distrust someone like that, especially at the UM, the university that Plaintiff has loved for decades.

142.   Instead of moving Anderson to an administrative position where Anderson could not treat any more students, as promised to Keith Moree, Easthope and other high-ranking executives at UM, with deliberate indifference, moved Anderson from UHS and put him in a position where he could, once again, treat and abuse young male students as the first paid, full-time Athletic Department physician.

143.   The "handshake deal" that Easthope proposed to Mr. Moree was but just one more affirmative, and deceptive, act by UM and its officers to prevent any public or private inquiry into Anderson's sexually predatory conduct, and so allowed Anderson to escape investigation.

144.   Easthope's contrivance – the handshake deal – kept hidden, for at least a second time, Anderson's abuse of male students, which if not kept hidden by the

38

actions of Easthope and others, would have led those unwitting Anderson victims –
those who were anally penetrated and subjected to excessive genital groping – to
discover that Anderson's acts were not medically necessary and appropriate acts, but
rather acts done for Anderson's sexual gratification.

145. Thus the "handshake deal" allowed Anderson to escape investigation
and likely discovery in 1981, and so (a) prevented the discovery by students and
student athletes who were digitally penetrated or fondled by Anderson before 1981
from discovering that those acts were not medically necessary, but rather were
sexual assaults and (b) hindered future victims of Anderson from acquiring the
information that (i) Anderson engaged in medically unnecessary acts to commit
sexual assault and (ii) UM, through its most senior administrators, employed a false
artifice and misrepresentation that Dr. Anderson was an ethical and competent
doctor.

146. Easthope's response (or lack of response), handshake deal, and
deliberate indifference to Moree's report of abuse added to the creation of and
deliberate indifference to a sexually hostile environment in the Athletic Department
and UHS, placing unsuspecting male students and student athletes at a heightened
risk for sexual assault by Anderson.

**UM moved Anderson full-time to the Athletic Department.**

147. According to longtime UM athletic trainer Russell Miller, Athletic

39

Director Don Canham, a legendary and powerful figure at the UM, "worked out a deal" to bring Anderson over to the Athletic Department.

148.   Anderson himself told the Ann Arbor News that Canham created a brand-new position for him to become the "formal team physician" in 1981.   See the Ann Arbor News, 6/10/1999, p. B7.

149.   UM personnel records confirm that Anderson was moved from the position Senior Physician at UHS to the full-time position of Senior Physician in the Athletic Department on July 1, 1981.

150.   Protected by UM executives, Anderson used this new paid position to abuse hundreds of UM male student athletes.

151.   Dana Mills, the then Administrative Manager at the UHS, told Detective West that the "V.P.'s Office" would have been responsible for Anderson's transfer to the Athletic Department.

152.   Anderson was highly regarded as a university physician, especially by leaders in the Athletic Department, including a longtime UM athletic trainer who called Anderson an "unbelievable team doctor"; another UM athletic trainer who called Anderson "very incredible"; and one longtime coach of the UM football coaching staff during the 1980s, 1990s, and 2000s who called Anderson "a tremendous asset."

40

**In 1982 or 1983, a non-player student member of the UM football program reported Anderson's sexual assaults on that student to Athletic Director Don Canham.  UM affirmatively chose to not investigate.**

153.   John Doe EB-17, Case No. 2:20-cv-12038-BAF-RSW, ECF No. 1, filed 07/30/20, PageID.37, was a student play-by-play announcer for the UM football team between 1981 and 1983.

154.   On the recommendation of a UM football coach, John Doe EB-17 saw Dr. Anderson to treat his migraine headaches.

155.   During three migraine headache treatments, Anderson digitally penetrated John Doe EB-17 more than one time, who understood that these were sexual assaults.

156.   John Doe EB-17 reported the anal assaults to the football coach who referred him to Anderson, and this coach became visibly angry about Dr. Anderson's conduct and immediately sent John EB-17 to report the assaults to Athletic Director Canham.

157.   John Doe EB-17 reported the assaults to Athletic Director Canham and told the Detroit Free Press that Canham's response "literally, was just to blow me off. He did nothing."

158.   John Doe EB-17 further told the Detroit Free Press that Canham "was so powerful he was able to shut down the reports (of Anderson's sexual abuse)."

159.   This deliberate act of Athletic Director Canham to rebuff another report

about Anderson's sexual assaults and to not investigate the complaint allowed Anderson to escape investigation and likely discovery in 1982 or 1983, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1983 from discovering, after an investigation into John Doe EB-17's complaint, that those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**UM's condoning of Anderson's assaultive conduct is further shown by trainer (now Assistant Athletic Director) Paul Schmidt's comments to a freshman football player in the late 1980s.**

160.   Plaintiff John Doe MC-27, who filed a similar complaint against UM in Case 2:20-cv-10785-VAR-EAS on March 26, 2020, attended UM in the 1980s and 1990s on an athletic scholarship for football.

161.   During John Doe MC-27's first physical examination by Anderson, Anderson groped, fondled, and cupped John Doe MC-27's penis and testicles for an excessively long time while Anderson's face was within inches of John Doe MC-27's penis and testicles.

162.   John Doe MC-27 encountered longtime UM trainer Paul Schmidt and

other trainers as he (John Doe MC-27) exited this initial, inappropriate freshman football physical examination by Anderson.

163.   Seeing that John Doe MC-27 was exiting his examination by Anderson, trainer Paul Schmidt laughed and told John Doe MC-27 "get used to that (Anderson's examination)."

164.   The other trainers laughed as well, and it was clear to John Doe MC-27 that Schmidt and the other trainers knew what Anderson was doing in the exam room to student athletes.

165.   It was this type of deliberate indifference and acceptance of Anderson's acts by trainers that also normalized Anderson's acts as required medical acts or treatment for all student athletes across all teams as just part of participating in UM athletics.

166.   Schmidt is still employed by UM and is currently the Assistant Athletic Director for the Athletic Department.

**In 1988, another football player reported more sexual assaults by Dr. Anderson to Athletic Department employee and Head Football Trainer Russ Miller. Once again UM affirmatively chose to not investigate.**

167.   John Doe EB-19, Case No. 2:20-cv-12038-BAF-RSW, ECF No. 1, filed 07/30/20, PageID.39, was a UM football player who was "sexually abused and molested by Dr. Anderson from approximately 1988 to 1989 during required physical examinations".

43

168. John Doe EB-19 reported Anderson's predatory sexual misconduct to Russ Miller, a long time Athletic Department trainer, who was the Head Trainer for the football team at that point in time.

169. Despite his status as Head Trainer, the primary non-medical-doctor team official who was responsible for the football team's players' health and well-being, and the person who would send players to Dr. Anderson and represent to players that Dr. Anderson was a good doctor, Mr. Miller decided to not investigate Dr. Anderson or do anything further with John Doe EB-19's reported information.

170. This deliberately indifferent act of Mr. Miller to ignore a report of a threat to players' safety and to not investigate John Doe EB-19's complaint allowed Anderson to escape investigation and likely discovery in 1988, and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1988 from discovering, as result of an investigation into Anderson, that those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**In 1993, a female track athlete complained that Dr. Anderson required women athletes undergoing scoliosis checks to be topless for the exams. The Athletic Department removed Dr. Anderson from conducting any further exams of female tracks athletes, but did not remove Dr. Anderson from conducting any further exams on male athletes, despite multiple complaints. Rather, UM affirmatively chose to not investigate male athlete complaints.**

171.  In 1993, a female track athlete complained to then assistant, now Associate Head Coach of the Track Team and Head Coach of the Women's Cross Country Team Mike McGuire that Dr. Anderson conducted inappropriate – but not assaultive – exams of women athletes by making the women remove their tops (rendering them topless) while checking for scoliosis.

172.  Coach McGuire addressed this issue with Athletic Department administrator Peg Bradley-Doppes and the Athletic Department arranged to have the women athletes examined by a different female physician.

173.  Despite the inappropriate nature of the exam, and the red flag it raised, on information and belief, the Athletic Department did not investigate or inquire into how Dr. Anderson was conducting any of his other physical examinations on other teams or other athletes.

174.  Further, this incident demonstrates UM's disparate treatment of male athletes; namely, UM showed deliberate indifference to complaints by multiple male athletes over the prior two plus decades regarding sexual assaults and chose to ignore and not investigate those complaints.

175.  This change in protocol regarding the treatment of female athletes, with

45

no commensurate inquiry into how Anderson conducted his physical examinations of male athletes (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1993 from discovering, as result of an investigation into Anderson, that those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**In 1994 the Michigan Department of Licensing and Regulatory Affairs ("LARA") investigated Dr. Anderson for sexually preying on a student in the 1970s. UM affirmatively chose to not investigate.**

176. In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The complainant reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs ("LARA").

177. In 1994, Dr. Anderson was both an employee of the UM Athletic Department and the UM Medical System a/k/a Michigan Medicine, as well as a professor in the UM Medical School.

178. It is the practice of LARA, in the ordinary course of a reported sexual assault by a regulated professional, to report that complaint to those organizations

(UM Athletic Department, Michigan Medicine, and UM Medical School) that employ the challenged professional.

179.   This occurs as LARA seeks medical records from the investigated doctor's offices, seeks to identify other medical professionals or lay witnesses from the investigated doctor's offices, and performs other investigative activities of patient complaints that the investigated doctor's employer(s) ordinarily and routinely become aware of (given the employer controls the records sought and employs the witnesses who are sought as well).

180.   On information and belief, when informed of this LARA investigation, each of Dr. Anderson's 3 UM-affiliated employers chose to continue employing him without any investigation of his actions, and so hindered the acquisition of any information that would have disclosed the medically unnecessary acts performed by Anderson, including digital anal penetrations and excessive fondling of genitals and penises on his pre-1994 victims, were not in fact medically necessary and instead sexual assaults.

181.   These affirmative and independent decisions by each of Anderson's employers – the Athletic Department, Medical School, and Michigan Medicine/UM Hospital System – each independently allowed Anderson to escape investigation and likely discovery in 1994,  and so (a) prevented the discovery by students and student athletes who were digitally penetrated or fondled by Anderson before 1994 from

discovering, after an investigation by UM into the LARA complaints, that those acts were not medically necessary, but rather were sexual assaults and (b) hindered future victims of Anderson from acquiring the information that (i) Anderson engaged in medically unnecessary acts to commit sexual assault and (ii) UM, through its most senior administrators, employed a false artifice and misrepresentation that Dr. Anderson was an ethical and competent doctor.

**Evidence of Anderson's continued authority and influence within the Athletic Department and UM's failure to act despite repeated assaults and reports of repeated assaults.**

182.   It is a sign of Anderson's power and influence at the UM that UM adopted mandatory student athlete physicals only after Anderson recommended this mandate; which, of course, gave Anderson increased access to male student athletes.

183.   It is a further sign of Anderson's power and influence at the UM that Anderson travelled with the UM's vaunted football team, stayed in the football team's hotel as part of the Athletic Department's traveling party, was included in every football team end-of-year bowl VIP traveling entourage, and was a fixture on the sidelines during Michigan's nationally televised football games.

184.   Archived records at the UM's Bentley Library further describe that Anderson's influence within the Athletic Department was such that he was able to quash a proposal to allow the athletes more latitude in choosing treatment by doctors other than Anderson.

48

185.   Anderson remained in a position of power and authority within the Athletic Department even though written exit evaluations by graduating senior athletes routinely gave Anderson poor grades for his treatment of the student athletes that he was preying on.

186.   Anderson treated UM athletes for every medical ailment, complaint, and injury as their UM-assigned internist. He served as their first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones.

187.   During his employment, agency, and representations with UM, Anderson sexually assaulted, abused, and molested male student athletes by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

188.   Because UM took no action to investigate the complaints from students that began as early as 1968, or earlier, and took no corrective actions even after Easthope attempted to fire Anderson in 1979, students and student athletes were sexually assaulted, abused and molested by Anderson through nonconsensual digital anal penetration, and nonconsensual sexual touching of genitals.

189.   The students he abused did not understand (as UM did) the nature of the treatment Anderson administered, or rather that his putatively necessary medical

treatment was not done to heal them but rather to satisfy Anderson's sexual desires.

190.   In this way, student athletes like Plaintiff did not understand -- just as Ron Weiser, the current chair of Defendant UM Board of Regents, did not understand while he was competing on UM's wrestling team and even later -- that Anderson's putative medical treatment was in fact sexual assault.

191.   In particular, because so many were victimized, student athletes "normalized" Anderson's abuse and accepted it as part of what they had to endure as an athlete already under intense, grueling training and physical demands, and they did not know they were victims of assault at the time it occurred.

192.   Although uncomfortable with the treatments, the student athletes, who were trained to endure discomfort, were led to believe by those in authority, including Athletic Director Canham, and witting and unwitting coaches and trainers, and Anderson himself, that the treatments were medically necessary or helpful.

193.   The whole of the Athletic Department, including the coaches and athletic trainers, represented continually that Dr. Anderson was part of the UM medical team that made UM the finest place for any student athlete to receive medical care in the whole country.

194.   This is illustrated by what one former UM football player and assistant football coach said in a November 2008 newspaper obituary of Dr. Anderson, where that coach relayed how one twenty-year former UM head

football coach unwittingly boasted about Anderson to football recruits:

> "…Anderson was part of a team of physicians about whom Bo Schembechler boasted to prize recruits. [The head coach] valued him (Dr. Anderson) greatly and had great trust and confidence in him…We used to tell people when we recruited them, **'You will get no finer medical care.'"**. (emphasis added)["Beloved University of Michigan Athletic Department physician Robert E. Anderson dies", Ann Arbor News, 11/30/2008. ].

195.   And so coaches and trainers became the unwitting (or for some coaches specified earlier in this Complaint, witting) relators of this central misrepresentation – that Dr. Anderson was a competent and appropriate physician to treat Plaintiff – that student athletes, including Plaintiff, relied on, when in fact several highly-placed UM officials like Associate Vice President Easthope, Vice President Johnson, and Athletic Director Canham knew that Anderson repeatedly committed sexually predatory acts in the guise of medical treatment when given the opportunity.

196.   So deliberately indifferent was UM that when Anderson resigned on January 3, 2003, Cheryl Sweetland, Program Director for Academic Primary Care (which includes UHS) for Michigan Medicine recommended Anderson for rehire "in a similar position" if Anderson ever reapplied for a position with UM.

197.   On July 18, 2018, UM alumnus, Tad Deluca, sent a letter to Warde Manuel, UM Athletic Director, notifying Manuel—as he did Don Canham in 1975— of Anderson's sexual assault while Deluca was a student between 1972 to 1976.

198.   UM then requested the UM Public Safety and Security police

department to open a non-public investigation, but UM did not take any  action to notify former students and/or the public about the allegations and/or the investigation until 19 months later – after the Detroit News wrote a lengthy story exposing UM and Dr. Anderson.

199.   As UM President Schlissel admitted on February 20, 2020, "Our (UM) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

200.   As stated above, at least one of the UM Board of Regents had personal knowledge that the complaints received on July 18, 2018, were and are true:  Ron Weiser, chairman of the UM Board of Regents.

201.   Another member of the UM Board of Regents, Regent Paul Brown, recently announced that three members of his family who were student athletes at UM had also been sexually assaulted by Anderson.

202.   Nonetheless, neither the UM nor the Board of Regents took any steps to notify the public or its alumni student athletes about Anderson's abuse until compelled to do so by the press in February 2020.

203.   UM and the UM Board of Regents' 19-month delay in notifying the public and alumni about Anderson's abuse of student athletes (when impending disclosure by the Detroit News forced UM's hand) is consistent with the pattern of UM's recent reactions to sexual abuse allegations: for several years, Defendants

have been under intense media, public, and government scrutiny regarding their mishandling of sexual harassment and sexual assault by faculty members, including, but not limited to Professor David Daniels; several Title IX complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

204.   These patterns demonstrate longstanding deliberate indifference to victims of sexual assault and so heighten the likelihood of sexual assault on UM's campus.

205.   At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan.

206.   At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or UM.

207.   At all relevant times, including the mid-1960s to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

V.   **PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS**

208.   Plaintiff was recruited out of high school by college football programs from across the Nation and chose to attend UM to play football.

209.   Plaintiff chose UM because, among other reasons, its tradition, the universal respect for its degrees, its national reputation for leadership and integrity,

and the bond he built with the coaches on staff during the recruiting process.

210.   When Plaintiff was recruited, UM's football coaches including Head Coach Bo Schembechler, Assistant Coach Bill McCartney, and other various assistant coaches assured Plaintiff and his parents that he would be protected at UM.

211.   Plaintiff (and his parents) also trusted and relied on Head Coach Schembechler's and Coach McCartney's and the other assistants' statements and representations made during the recruiting process that they would protect Plaintiff and ensure that UM and the team would take care of Plaintiff's athletic, academic, and medical needs while an athlete at UM.

212.   More specifically, Plaintiff trusted and relied on Head Coach Schembechler's, Coach McCartney's and the other assistants' specific representations that they would, among other things, take care of Plaintiff's (a) athletic needs through excellent coaching and training; (b) academic needs through tutoring and other academic support provided by the UM and its Athletic Department, if needed; and (c) medical needs through free quality health care to treat any injuries and illnesses Plaintiff incurred during his time on the team, which included access to UM's world-renowned hospital, and a team of excellent doctors who were represented as ethical, and would only do good, and not harm, Plaintiff and his body during the course of their medical treatments.

213.   During his time on the team in the 1980s, Plaintiff further trusted and

54

relied on the continuing, ongoing, and numerous representations of Head Coach
Schembechler, Coach McCartney, and the other assistant coaches, and his trainers,
including Russ Miller, Head Trainer for the UM football teams, and Miller's various
assistants that the medical staff should and would address all of his medical needs,
and that because UM and the team were first class organizations – literally, the
"leaders and the best" –  any and all medical treatment and rehabilitation services
would only be done if medically necessary, with the best treatment available, by the
best doctors possible, and only if appropriate and ethical to ensure Plaintiff became
and stayed healthy, and not for any purpose that would do any harm to Plaintiff's
body or mind.

214.   Plaintiff encountered a football program and culture where the coaches
set the tone to ensure every detail was done in a much more comprehensive, thought-
out, and thorough manner than anything he had encountered before -- from the drills
to conditioning to diet to even off-the-field activities, such as academics and how
one should conduct himself as a member of the team.

215.   Not only was the program more thorough and comprehensive than
anything Plaintiff had encountered before, but practices were longer, the energy
level more intense, and the expectation to do and endure more was much higher.

216.   Before each football season began, Plaintiff was required to see
Anderson for a physical examination to be cleared to wrestle.

55

217.   The team coaches and trainers also told Plaintiff that Anderson was Plaintiff's primary care physician and that Plaintiff should see Anderson for any minor sports injury or common illness.

218.   And so, between physical examinations over five years, treatments of injuries to body parts such as broken bones in Plaintiff's hand and arm, and treatments for illnesses such as colds and flu and strep throat and other ailments, Plaintiff saw Anderson at least twenty-five (25) times  or over five (5) times each year  over his five-year career at UM.

219.   On at least seven (7) or more of those occasions, Anderson digitally penetrated Plaintiff's anus.

220.   And, on at least seven (7) or more of those different occasions, Anderson excessively played with and fondled Plaintiff's penis and testicles.

221.   All these acts occurred in Dr. Anderson's medical exam room in his offices in the UM athletic facility while Plaintiff was seeking medical treatment.

222.   Plaintiff considered or assumed these acts by Anderson were necessary requirements of participating on the UM football team and playing football in college at the highest level.

223.   Plaintiff also assumed that these acts were "normal" or "customary" because many of his teammates told Plaintiff that Anderson did similar acts to those teammates.

56

224.   Further, because all the members of the UM football coaching staff, including Coach Schembechler and his assistants, and all members of the athletic training staff, especially Head Trainer Russ Miller, continued to state and represent that Dr. Anderson was a good doctor and the appropriate doctor to see all during Plaintiff's football career, Plaintiff relied on those representations and so did not ever question Anderson's acts as not being medically necessary.

225.   Plaintiff also was and is aware that Coach Schembechler and his coaching staff, and especially Russ Miller and the other assistant trainers continued to make representations about the competency and professionalism of Dr. Anderson even after Plaintiff graduated.

226.   Because these representations vouching for Anderson's competency, professionalism, ethical nature and appropriateness were repeated so often by the coaching staff and trainer staff – especially Head Trainer Russ Miller - during Plaintiff's career (and after), Plaintiff cannot provide the specific dates of the representations[1] but can relay that these representations occurred in, among other areas, the UM football practice field, the Big House aka Michigan Stadium, weight room, Anderson's office, and the football team's locker room throughout his five years as a Michigan football player.

---

[1] However, because UM is aware of the years that Plaintiff participated in athletics at UM (in accordance with the requirement of ECF 73), UM already knows the date range of the representations.

57

227.   Plaintiff also assumed Anderson's acts were medically necessary because Anderson appeared to successfully address any minor medical complaint that Plaintiff ever had.  And from conversations with fellow teammates, it appeared Anderson directly addressed their injuries or illnesses as well when they were sent to Anderson for treatment.

228.   And so, in much the very same way as Regent Weiser, Plaintiff had no way of knowing Anderson was sexually assaulting him in the guise of medical treatment.

229.   From his earliest days as an elite football player, Plaintiff learned the importance of being a compliant patient from his coaches, and to follow any instructions from a doctor, trainer or physical therapist, even if that instruction involved discomfort or pain (such as in physical therapy) in order to get healthy and get back on the mat as soon as possible. Consequently, to the extent Plaintiff felt any discomfort, Dr. Anderson's acts were viewed as just the necessary part of doing what was necessary to be a successful football player at UM.

230.   As a result, and as a young college student without any medical training, it was Plaintiff's belief that these acts by Anderson were medically necessary acts even if Plaintiff did not understand why they were done.

231.   Conversely, if Anderson did unnecessary medical acts, Plaintiff did not have the training or experience to identify those acts as unnecessary even if they

were different, uncomfortable, or unfamiliar to him.

232.   While Plaintiff competed on the football team as a recruited and desired athlete, Anderson was his assigned primary care physician.

233.   And since UM was responsible for the medical care of its student athletes, Anderson's services were readily available to Plaintiff and free of charge.

234.   As stated above, Plaintiff's head coach, assistant coaches, and trainers directed and required Plaintiff, and all other members of the football team, to see Anderson for all their medical needs.

235.   It was further required and expected that all football players not only see Anderson for any ailment, but also unquestioningly follow his procedures and orders.  In that way, the athletic program culture was very similar to the military.

236.   And just as Plaintiff, a high-performing student athlete, was used to following orders of coaches, whether it was regarding diet, exercise, training, and even academic performance, Plaintiff fell in line when he was instructed to treat with Anderson – and no other primary physician – while he was a UM student.

237.   Since staying on the team and in games was critically important to Plaintiff and his teammates, they accepted the grueling physical conditions required to keep them there, including Anderson's treatments.

238.   Plaintiff felt uncomfortable about Anderson's acts taken in the guise of medical treatment but accepted the acts as customary requirements of the Michigan

football program.

239.   Further, although the treatments made Plaintiff uncomfortable, Plaintiff was trained by his football and athletic regimen to do as he was ordered by those in positions of authority. Indeed, the physical and emotional rigors of college football require high tolerance to physical and emotional pain.

240.   Plaintiff trusted his coaches' and trainers' representations that Anderson was a good physician and that he had to see Anderson for every ailment throughout Plaintiff's career, and so he trusted Anderson as his physician.

241.   Plaintiff also trusted and relied on his coaches' representations, made to him and his parents during the recruiting process, that they would take care of him; and then during his playing career, Plaintiff trusted and relied on his  coaches' and trainers' representations that Anderson was a good, competent, and ethical doctor who would do Plaintiff no harm.

242.   At the time of Anderson's treatment – not knowing (a) Anderson's acts were motivated by a criminal sexual intent and (b) that UM knew of Anderson's criminality, yet intentionally, wantonly, or with deliberate indifference gave him access to sexually abuse male student athletes like Plaintiff – Plaintiff trusted the representations made to him that Anderson's actions, under the guise of medical treatment and in the confines of a medical examination room on UM's campus, were medically necessary and/or beneficial as treatment and/or diagnostic.

60

243.   When the abuse began, Plaintiff, a young and naïve man away from home, trusted Anderson as a medical professional and authority figure.

244.   Further, because the doctor-patient relationship is a special, confidential and trusted fiduciary relationship,[2] and given the fact Plaintiff's coaches and trainers relied on Anderson and vouched for his reputation, Plaintiff relied on his confidential relationship with Anderson – and the coaches' and trainers' validation of Anderson – such that he could never contemplate that Anderson would commit sexual assaults in the guise of medical treatment.

245.   Plaintiff relied on his special doctor-patient relationship with Anderson because Plaintiff had no medical training or experience, while Anderson was a highly educated and experienced licensed medical doctor; so the differences in their respective educational and knowledge bases was such that Plaintiff was not aware that Anderson's nonconsensual genital fondling and/or anal penetrations were not medical treatment, but instead sexual assault, abuse, and molestation.

246.   As UM President Schlissel stated, "The patient-physician relationship involves a solemn commitment and trust."

247.   Because UM took no action to investigate complaints since 1968, took

---

[2] See, for example, *Horizon Painting, Inc. v. Adams*, No. 265789, 2007 WL 600686, at *1 (Mich. Ct. App. Feb. 27, 2007).  And it is based on this fiduciary relationship that the Michigan Legislature statutorily recognizes a doctor-patient privilege. 600.2157. MCL 600.2157.

no corrective action to stop Anderson's abuse, and knew of Anderson's sexual abuse of male students under the guise of medical treatment which put him in a position to commit further acts of genital groping and/or digital anal penetrations of male college athletes between the early 1960s and 2003, UM knowingly placed Plaintiff in a position where he would likely be sexually abused.

248.   And because of UM's failure to act, despite knowledge that Anderson was preying on male college students under the guise of medical treatment, Plaintiff was in fact sexually assaulted, abused and molested by Anderson by nonconsensual digital anal penetration and genital fondling.

249.   The assaults could have been prevented if UM had acted on and/or investigated complaints against Anderson that UM had notice of as early as 1968 and earlier.

250.   The assaults on Plaintiff could have been prevented if UM had warned Plaintiff or properly supervised Anderson or trained Athletic Department supervisors such as Plaintiff's coaches and trainers. But UM failed to do any of these things that would have prevented Plaintiff's sexual abuse.

251.   Through Anderson's position with UM and his notoriety and respect in the UM community, particularly among high-ranking UM coaches and administrators, Anderson used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by UM.

252.   Plaintiff did not, and could not, consent to Anderson's purported medical treatments.

253.   All of Anderson's acts were conducted under the guise of providing medical care at his office at UM.

254.   The failure to give proper notice or to obtain consent from Plaintiff robbed him of the opportunity to reject Anderson's treatments.

## VI.   PLAINTIFF'S DAMAGES

255.   Plaintiff first learned Anderson was a serial sexual predator on or after February 19, 2020, when the news broke that several former students had come forward with stories of sexual abuse at the hands of Anderson under the guise of medical treatment while students at UM.

256.   Plaintiff's damages arise from two distinct and exclusive harms: (1) the revelation that Anderson's acts were not, in fact, acts done to render medical treatment, but rather criminal sexual conduct motivated by Anderson's illegal sexual intent, and so Plaintiff is a sexual assault victim; and (2) the revelation that the UM – an integral part of Plaintiff's life and identity for decades – foisted a known sexual predator on Plaintiff in the guise of a competent and concerned medical physician.

257.   Since these revelations, Plaintiff has been suffering shame, shock, humiliation, emotional distress, and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

63

258.   The news about Anderson has disturbed Plaintiff's innate sense of self-worth and self-identity, leading to anxiety and depression.

259.   Plaintiff has also suffered deeply, emotionally, and psychologically, in ways that have manifested physically, from discovering on or after February 19, 2020, that his beloved alma mater knew about Anderson's sexual assaults for decades; yet did nothing to stop Anderson.

260.   Aside from these understandable injuries, other harms include: (a) feeling betrayed because he was not protected by UM, coaches and trainers; (b) feeling betrayed because UM forced Anderson on him and his unsuspecting teammates knowing Anderson was a predator;  (c) worries and anxiety that friends and family may find out that Plaintiff was a victim; (d) anxiety about future interactions with the UM; and (e) extreme anxiety about how these harms will manifest themselves in Plaintiff's middle age and senior years.

261.   Despite knowledge about Anderson's misconduct, UM knowingly kept him in positions where he had direct and intimate access to prey upon college students and college athletes, such as Plaintiff, from the early 1960s to 2003.

262.   These revelations have been traumatic and emotionally and psychologically damaging, forcing Plaintiff to relive the trauma of what he now knows to have been sexual assault.

263.   It has shattered Plaintiff psychologically and emotionally to learn the

university he has spent his life being devoted to betrayed him and so many others by placing a sexual predator on staff where he had direct and unlimited access to young college students.

## VII. **THE PHYSICIAN-PATIENT FIDUCIARY RELATIONSHIP CREATED BY THE UM DEFENDANTS**

264.   Physicians like Anderson enjoy a power imbalance over patients, such as Plaintiff, in treatment because patients present with health concerns and are expected to comply with physicians' orders, including undressing.  *See* Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases, Sexual Abuse 2019, Vol. 31(5) 503–523, available at https://journals.sagepub.com/doi/10.1177/1079063217712217.

265.   In addition to the power imbalance, patients like Plaintiff often times cannot recognize abusive acts because they do not understand or know what is or is not medically necessary  *See* Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases, Sexual Abuse 2019, Vol. 31(5) 503–523, available at https://journals.sagepub.com/doi/10.1177/1079063217712217.

266.   Among other reasons, it is this social power imbalance and the fact that "physicians possess superior knowledge by virtue of their medical training" that the American Medical Association finds the doctor-patient relationship to be a fiduciary relationship.   Tanya J. Dobash, Physician-Patient Sexual Conduct: The Battle Between The State and The Medical Profession, 50 Wash. & Lee L. Rev. 1725

(1993), available at https://scholarlycommons.law.wlu.edu/wlulr/vol50/iss4/17.

267.   In the same way, both the Sixth Circuit Court of Appeals and Michigan courts recognize this fiduciary relationship between a doctor and his patient, where "the patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well".  *United States v. Tatum*, 518 F.3d 369, 373 (6th Cir. 2008); *Hammonds v. Aetna Cas. & Sur. Co.,* 7 Ohio Misc. 25 (N.D. Ohio 1965); *Utica Steel, Inc. v. Amormino,* No. 309112, 2014 WL 1401939, at *6 (Mich. App. Apr. 10, 2014). And it is in recognition of this fiduciary relationship that the Michigan Legislature created the statutory physician-patient privilege.   MCL 600.2157.

268.  As pled above, UM ordered Plaintiff to see Anderson, and only Anderson, as his UM-assigned primary care physician during the time Plaintiff was a member of his team, despite knowing he was a sexual predator of male student athletes.

269.   In this way, UM created a fiduciary relationship between Anderson and Plaintiff.

270.  Further, in doing so, UM became a fiduciary, both directly and vicariously, of the Plaintiff for all acts committed by Anderson during Anderson's physician-patient relationship with Plaintiff.

271.  And because UM forced this relationship on Plaintiff – a fiduciary

relationship with Plaintiff's UM-chosen physician, Anderson – UM as a principal to its agent Anderson, owed certain duties under fiduciary and agency law to affirmatively provide Plaintiff with more, not less information, and so UM was required to disclose those bad acts that UM was aware of and to inform Plaintiff of the true nature of Anderson's acts done during the course of medical treatment on the Plaintiff.

## VIII. <u>FRAUDULENT CONCEALMENT</u>

272.   The statute of limitations is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim" under M.C.L. § 600.5855.

273.   Both Anderson and Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and Athletic Department employees, fraudulently concealed the existence of Plaintiff's claims, both before and after Plaintiff's initial examination with Anderson, by, among other things, (1) concealing from Plaintiff that the uncomfortable procedures conducted during medical examinations were in fact sexual abuse, (2) concealing from Plaintiff that UM and its employees, agents, and representatives were aware of Anderson's sexual abuse and did nothing to stop it, (3) affirmatively telling Plaintiff the procedures were normal and/or necessary, (4) affirmatively telling Plaintiff that

67

Anderson was a good, competent, and appropriate doctor who would take care of the Plaintiff, and his teammates, before and after all of his examinations, (5) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, and (6) concealing from Plaintiff that UM was aware of Anderson's abuse since at least 1968, if not earlier, and thereby concealing UM's identity from Plaintiff as a "person who is liable for the claim," as set forth in more detail below.

**A.   Anderson's Fraudulent Concealment Imputed to UM.**

274.   Anderson made affirmative representations directly to Plaintiff, both orally and by act (referred to collectively as "Anderson's representations"), that include, among other representations, that:

a.   Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, required or "protocol", legitimate, and/or medically beneficial;

b.   Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, required or "protocol", legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 24;

c.   Anderson's anal penetrations and/or genital examinations were just another required procedure student athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

d.   Plaintiff was to comply with Anderson's acts to be properly

diagnosed, or to get better and be healed; and that Anderson's assaultive acts were medical acts done to forward Plaintiff's medical treatment.

275. Anderson's representations were false. The UM Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college athletes.

276. Anderson knew the representations were false. He conducted the sexual assaults for no reason other than for his own empowerment, sexual gratification, and/or pleasure. Anderson knew the genital examinations and/or digital anal examinations were not proper, appropriate, legitimate, and/or considered within the standard of care by any physician of any specialty and/or sports therapist, particularly as the patients were young men (generally ages 17-25).

277. Further, over the course of treating Plaintiff and his teammates and other athletes, on multiple occasions Anderson represented and stated his acts were "protocol", "what was necessary", "had to be done", or similar phrases, and/or Anderson represented that he was checking for an illness unrelated to the student athlete's complaint that gave rise to the visit to Anderson, such as prostate and/or testicular cancer.

278. These remarks normalized Anderson as just part of the comprehensive

69

and thorough nature of major college sports, and major college physicals, such that it happened to everyone and was not outside the norm, and was the medical equivalent of a new and arduous drill or conditioning technique that Plaintiff encountered at UM, but not in high school.

279.   Anderson's representations were material, in that had Plaintiff known the representations were false, Plaintiff would have never sought treatment or would have stopped seeking treatment from Anderson immediately.

280.   Anderson's representations were made with the intent that Plaintiff would rely on them (and Plaintiff did rely on them) as Anderson sought to continue sexually assaulting Plaintiff, and others.

281.   Anderson's representations were also made with the intent of concealing from Plaintiff that he had a cause of action against Anderson and/or UM.

282.   Plaintiff did, in fact, rely on Anderson's representations; indeed, Anderson's representations led Plaintiff to continue seeking treatment from Anderson, and had he known Anderson's representations were false, Plaintiff would have never sought treatment or would have stopped treating with Anderson.

283.   Anderson knew, and Plaintiff was, in fact, particularly susceptible to believing Anderson's misrepresentations because:

    a.    Plaintiff was a young and naïve adult;

    b.    Anderson's representations were made within the context of a
          pervasive culture created by statements made by representatives

70

of UM, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

c.  Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

d.  Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that Anderson's treatments were sexual assaults;

e.  Based on Neuroscience, the prefrontal cortex of the brain, which adults use to make decisions and distinguish right from wrong, is not fully formed until the age of 25;

f.  Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

g.  Plaintiff trusted Anderson due to his notoriety and reputation;

h.  Plaintiff was trained to not question coaches or trainers or team doctors if he wanted to stay on the team and remain at UM to earn his college degree;

i.  Anderson's supervisors, including highly placed UM executive officers such as Athletic Director Don Canham, Vice President Henry Johnson, and Associate Vice President Thomas Easthope, tolerated Anderson's abusive conduct and would not publicly report that abusive conduct;

j.  Plaintiff's coaches and trainers praised Dr. Anderson and his ability;

k.  Plaintiff had never previously heard about allegations in the

media regarding sexual assaults or misconduct by Anderson; and

i. Plaintiff was never told by Anderson that his conduct was sexual in nature, and unlike other victims of sexual abuse who are able to discern the sexual nature of their abuser's acts, these acts all occurred in the guise of medical treatment, in a doctor's office, and in the athletic facility building of one of the world's preeminent universities.

284. Accordingly, Plaintiff did not know, could not have reasonably known, had no reason to make inquiry, and was reasonably unaware of a possible cause of action that he had against Anderson and/or UM until he read an article on or after February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiff became aware he was the victim of sexual assault and that UM knowingly allowed and caused the abuse by permitting Anderson to continue to treat students and student athletes.

285. Anderson and UM also breached a fiduciary duty to Plaintiff, as Plaintiff was Anderson's patient and a student athlete entrusted to Andersons's care, and so his failure to disclose material information to Plaintiff was fraudulent.

286. Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

287. Anderson committed Fraudulent Concealment by concealing fraud

with affirmative acts designed and/or planned to prevent inquiry, so he and Defendants would escape investigation.

288.   At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of UM and operated within the scope of his employment, and his negligence and Fraudulent Concealment is imputed to UM.

289.   At all times material here, Plaintiff was free of any negligence contributing to the injuries and damages alleged.

**B.   Defendants' Fraudulent Concealment.**

290.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

291.   Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives and employees, and members of UM's administration, made affirmative representations to Plaintiff, referred to collectively as "Defendants' representations," that:

> a.   Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the

Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980;

b.   Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual Report to him" even though UM and its executives knew that Easthope had fired Anderson for his inappropriate sexual conduct toward male students;

c.   Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, required, appropriate, legitimate, and/or medically beneficial and part of the appropriate medical care that all athletes receive from the world-famous UM hospital and medical system;

d.   Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, required, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25;

e.   Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

f.   Anderson's genital groping and/or digital anal penetrations were just another required procedure student athletes must endure, to be obeyed without question as those acts would improve and/or were part of necessary medical treatment of an injury or illness;

g.   There was nothing wrong with anything Anderson did and so there was no possible cause to complain against Anderson and/or UM; and

h.   These affirmative representations were reasserted each time Defendants, their agents in the Athletic Department, head coaches, assistant coaches, and trainers sent an athlete to Anderson for treatment, as each order to see Anderson was an affirmative representation that Anderson was competent, ethical, and would "do no harm", or assault the respective student athletes, but rather would heal the athlete's injury or illness.

74

292.    Defendants' representations were false. The UM's Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

293.    Defendants and/or their agents knew the representations were false. Defendants received several complaints since, at least, 1968 about Anderson's sexual assaults prior to Plaintiff arriving on campus. Indeed, Defendants removed Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating UM's knowledge the representations were false.

294.    Defendants and/or their agents made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital examinations and digital anal penetrations had been questioned in the past, and indeed, found grounds for termination and/or demotion in 1979.

295.    Defendants' and their agents' representations were material, in that had Plaintiff known the representations were false, he would have stopped seeking treatment from Anderson immediately.

75

296.   Defendants' and their agents' representations were made with the intent that Plaintiff would rely on them as UM sought to prevent Plaintiff from discovering he had a cause of action against Anderson and/or UM.

297.   Plaintiff did, in fact, rely on Defendants' and its agents' representations; indeed, the representations led Plaintiff to continue seeking treatment from Anderson during his entire career at UM.

298.   Defendants and its agents concealed the fraud by the affirmative acts described above that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, and restated, in partial summary, as UM:

     a.    Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning and one of the finest health care systems in the world;

     b.    Affirmatively lied in written publications about Anderson "resigning" from UHS when he was fired, and then reinstated but demoted him, for sexual assaults on male students;

     c.    Repeatedly and affirmatively chose to ignore and/or refuse to investigate complaints about Anderson's sexual assaults and repeated and affirmatively chose to not discipline Anderson for those inappropriate genitals and anal examinations;

     d.    Repeatedly and affirmatively refused to publicize or disseminate information about Anderson's prior and ongoing abusive acts or his *modus operandi* so students and student athletes could be informed that Anderson was committing sexual acts in the guise of medical treatment and those students and student athletes so informed would be able to make reasonably diligent inquiry about their treatment or try to avoid Anderson; and

e.   Repeatedly and affirmatively refused to follow and/or comply with the UM's own sexual harassment policies which required reporting and disciplining of Anderson.

299.   Defendants knew, and Plaintiff was, in fact, particularly susceptible to

believing Defendants' representations because:

a.   Anderson's abuse occurred while Plaintiff was a young and naïve adult;

b.   Defendants' representations and acts were made within the context of a medical treatment, and no undergraduate student such as the Plaintiff or Ron Weiser had or would have the knowledge or means to question Anderson's acts as medically unnecessary;

c.   UM created a pervasive culture through statements made by UM representatives, including witting and unwitting coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned, and that his acts were just part of the finest care available;

d.   Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve extended genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed genital and/or anal examinations from a sexual assault;

e.   Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the exam room to inform Plaintiff that he had been sexually assaulted and had a cause of action;

f.   Based on Neuroscience, the prefrontal cortex of the brain, which adults use to make decisions and distinguish right from wrong, is not fully formed until the age of 25;

77

g.    Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.    Plaintiff relied on the Athletic Department which provided the means for the Plaintiff to stay at UM and so trusted Anderson due to his notoriety and reputation;

i.    Plaintiff was compelled by Athletic Department policy to see no other primary care physician other than Anderson if he wanted to stay on the team and remain at UM to earn his college degree, and thus had no other sports team doctor to compare against Anderson;

j.    Plaintiff had no reason to believe or be aware of any other students coming forward with allegations of abuse, particularly because Anderson and UM concealed all such allegations;

k.    The culture of the Athletic Department normalized Anderson's treatments;

l.    Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

m.    Even non-Athletic Department executives at UM such as Associate Vice President Easthope and Vice President Johnson hid and concealed Anderson's sexual predatory conduct from the public, UM's students, and UM's student athletes.

300.    Accordingly, Plaintiff did not know, could not have reasonably known, could not have reasonably inquired, and was reasonably unaware of a possible cause of action that he had against Anderson and/or Defendants until he read or heard or saw news reports on or after February 19, 2020, regarding the decades long cover up by UM of multiple (by Easthope's estimation in the press accounts, "100") sexual assaults on UM students and student athletes, at which point Plaintiff became aware

78

he was the victim of sexual assault and that Defendants indirectly or directly caused the abuse by allowing Anderson to continue to treat students and student athletes, after UM knew he was a sexual predator.

301. Because UM had a fiduciary duty to Plaintiff, and it employed Anderson who had a doctor-patient relationship with Plaintiff, the failure to disclose material information is also *per se* fraudulent concealment.

302. At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

303. Defendants' representations – which were relied on by Plaintiff - caused Plaintiff's injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or after February 19, 2020; and (3) discovering Plaintiff's beloved alma mater that he devoted his life to betrayed him by knowingly placing him in the medical care of a known sexual predator.

304. Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's

fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

305.   Defendants committed Fraudulent Concealment, as described in detail above and below.

## COUNT I:
## VIOLATION OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ*.[3]

306.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

307.   Title IX's statutory language states, "No person in the United States shall on the basis of sex, be ... subject to discrimination under any education program or activity receiving Federal financial assistance ..."

308.   Plaintiff is a "person" under the Title IX statutory language.

309.   Unwelcome sexual assault advanced because of the victim's sex is discrimination on the basis of sex.

310.   Anderson's sexual assault on Plaintiff because Plaintiff was a male was discrimination on the basis of sex.

311.   UM receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20

---

[3] Plaintiff outlines his damages, which is needed for many of the following counts, in general allegations at the end of the counts section below, and those general damage allegations are incorporated by reference into all applicable counts to avoid excessive redundancy and for ease of reading by the Court.

U.S.C. § 1681(a), *et seq*.

312.   UM is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

313.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

314.   Anderson's actions and conduct were carried out under one of UM's programs, which provides medical treatment to students, student athletes, and the public.

315.   Anderson's conduct and actions toward Plaintiff, that being nonconsensual genital manipulation and/or digital anal penetration, constitutes sex discrimination under Title IX.

316.   As early as 1968, or earlier, an "appropriate person", including, among others, the coaches, trainers, and administrators named above, at UM had actual knowledge of the sexual assault, abuse, and molestation of young men committed by Anderson.

317.   Specifically, Defendants were notified about Anderson's sexual abuse and molestation by young male students in or around 1968, 1969, 1973, 1975, 1976, 1979, 1980, 1982, 1983, 1988, 1993, and 1994, and, on information and belief, on many other occasions before and after 1980.

81

318. Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1968 or earlier.

319. After the 1968, 1969, 1973, 1975, 1976, 1979, 1980, 1982, 1983, 1988, 1993, and 1994 complaints, Anderson continued to sexually assault, abuse, and molest young male students, and later exclusively male student athletes, including but not limited to Plaintiff.

320. Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

    a.    Failing to investigate and address other victim's allegations as required by Title IX;

    b.    Failing to adequately investigate and address the complaints regarding Anderson's conduct;

    c.    Failing to institute corrective measures to prevent Anderson from violating and sexually abusing other students and individuals, including minors; and

    d.    Failing to adequately investigate the other multiple acts of deliberate indifference described above.

321. Defendants acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

322. Defendants' deliberate indifference allowed Anderson to continue sexually assaulting athletes and other individuals and Plaintiff until he retired from

UM in 2003.

323.   Between the dates of the middle 1960s through 2003, and perhaps earlier, Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to and were deliberately indifferent to Anderson's sexual assaults and sex-based harassment of young male students, and later young male student athletes, on and off school premises.

324.   Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff to further harassment and a sexually hostile environment, effectively denying his access to educational opportunities at UM, including medical care.

325.   As a result of Defendants' deliberate indifference, Plaintiff was forced to endure a sexually hostile environment on campus, and Plaintiff suffered loss of educational opportunities and/or benefits. Plaintiff has incurred, and will continue to incur, attorney's fees and costs of litigation.

326.   At the time of Anderson's assaults on Plaintiff, Plaintiff was unaware, or with reasonable diligence could have been aware, of Defendants' institutional failings with respect to their responsibilities under Title IX because Defendants actively concealed their own misconduct. Plaintiff first learned about Defendants' institutional failings under Title IX in February 2020 when information about Anderson's sexual abuse and Defendants' cover up of it was published by the press.

327. At the time of Anderson's assaults on Plaintiff, Plaintiff was unaware of Defendants' pervasive failings with respect to their response to a known issue of sexual misconduct within its UHS and Athletic Department dating back several years prior to Plaintiff's sexual assaults. Because Defendants actively concealed this information from Plaintiff and the public, Plaintiff could not, with reasonable diligence, have learned this information independently. Plaintiff first became aware of Defendants' deliberate indifference to a known issue of sexual misconduct within its UHS and Athletic Department in February 2020 when information about Anderson's sexual abuse and Defendants' cover up of it was published by the press.

328. At the time of Anderson's assaults on Plaintiff, Plaintiff was unaware of Defendants' deliberate indifference to the actual knowledge that Anderson had been accused of sexually assaulting several UM students. Because Defendants actively concealed this information from Plaintiff and the public, Plaintiff could not, with reasonable diligence, have discovered this information independently. Plaintiff first became aware of Defendants' deliberate indifference to the actual knowledge of Anderson's history of pervasive sexual violence in February 2020 when information about Anderson's sexual abuse and Defendants' cover up of it was published by the press.

329. Defendants maintained a policy and/or practice of deliberate indifference to reports of Anderson's sexual misconduct.

330.   Defendants' policy and/or practice of deliberate indifference to reports of Anderson's sexual misconduct created a heightened risk of sexual assault.

331.   Defendants had the ability to prevent Anderson's abuse but failed to do so.

332.   Because of Defendants' policy and/or practice of deliberate indifference, Plaintiff was sexually assaulted by Defendants.

## COUNT II:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – STATE CREATED DANGER

333.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

334.   The due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law.

335.   Defendants deliberately exposed Plaintiff to a dangerous sexual predator, Anderson, knowing Anderson could and would cause serious damage by sexually assaulting male students, especially male student athletes, on campus.

336.   This conduct was culpable in the extreme.

337.   Plaintiff was a foreseeable victim of Defendants' decision to make Anderson the physician to the UM Athletic Department.

338.   Plaintiff's sexual assault was foreseeable and direct.

339.   The decisions and actions to deprive Plaintiff of a safe campus

constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiff.

340.   Defendants acted in willful disregard for the safety of Plaintiff.

341.   Defendants have a fiduciary duty to protect students, like Plaintiff, from harm; and Defendants breached that duty by allowing Plaintiff's sexual assault by placing student athletes in the care of a known sexual predator.

342.   Defendants created the opportunity for Anderson to sexually assault Plaintiff that he would not otherwise have had the opportunity to do but for Defendants giving Anderson the job as Athletic Department physician when it was known to Defendants that he was a sexual predator.

343.   At all relevant times, Defendants and Anderson (as Defendants' agent) were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

## COUNT III:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY

344.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

345.   The due process clause of the 14th Amendment includes an implied right to bodily integrity.

86

346.   Plaintiff enjoys the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

347.   At all relevant times, Defendants UM, UM Regents, and Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

348.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

349.   As a matter of custom, policy, and/or practice, Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

350.   Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

351.   Defendants' failure to address these patients' complaints led to an unknown number of individuals (aside from Plaintiff) being victimized, sexually assaulted, abused, and molested by Anderson.

352. Additionally, Defendants' failure to properly address the 1968, 1969, 1973, 1975, 1976, 1979, 1980, 1982, 1983, 1988, 1993, and 1994 complaints, and, on information and belief, on many other occasions before and after 1980, regarding Anderson's sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Anderson.  Indeed, all that UM needed to do was fire Anderson in 1979.

353. Ultimately, Defendants failed to adequately and properly investigate the complaints of sexual assault, and violated Plaintiff's clearly established constitutionally protected rights, by failing to:

   a.   Not foist Anderson on the population of scholarship male student athletes, who were accustomed to physical and emotional discomfort, and because they needed the scholarships, would be highly unlikely to complain about Anderson's conduct;

   b.   Perform any investigation into conduct by Anderson after receiving multiple complaints of sexual assault; and

   c.   Thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Anderson.

354. By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Anderson's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

355. Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for

maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

356.   Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Anderson, with the result that Anderson was allowed to violate the rights of persons such as Plaintiff with impunity.

## COUNT IV:
## FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

357.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

358.   Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Anderson and all faculty and staff regarding their duties toward students, faculty, staff and visitors.

359.   Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

    a.    Perceive, report, and stop inappropriate sexual conduct on campus;

    b.    Provide diligent supervision over student athletes and other individuals, including Anderson;

    c.    Report suspected incidents of sexual abuse or sexual assault;

    d.    Thoroughly investigate any complaint of sexual misconduct against Anderson;

e.   Ensure the safety of all students, faculty, staff, and visitors to UM's campuses premises;

f.   Provide a safe environment for all students, faculty, staff, and visitors to UM's premises free from sexual harassment; and,

g.   Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

h.   The above list of duties is not exhaustive.

360.   Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights.

361.   Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of student athletes.

362.   Defendants' failure to adequately train is closely related to or actually caused Plaintiff's injuries.

363.   As a result, Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**DAMAGES FOR ALL CAUSES OF ACTION, COUNTS I-IV**

364.   As a direct and/or proximate result of Defendants' conduct, Plaintiff suffered and suffers discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and such other injuries and physical

90

manifestations as may appear during the course of discovery and trial in this matter.

365.   These irreparable harms Plaintiff suffers, and will continue suffering, are proven damages typically suffered by young men when sexually assaulted by another man who is a trusted person and/or medical provider.

366.   Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression. See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).

367.   Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim. See *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1): 21-46); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

368.   When sexual abuse is perpetrated by a medical provider, patients often lack the ability to comprehend the abuse due to the provider's position of access,

trust and authority and commonly suffer from emotional distress, humiliation, and the inability to trust medical care providers or the medical care professional generally. See *Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2-abuse-of-power.htm.

369.   In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiff has and continues to suffer irreparable harm as a result of the violations.

**WHEREFORE,** Plaintiff requests this Court and the finder of fact to enter a Judgment in Plaintiff's favor against Defendants on all counts and claims above in an amount consistent with the proofs of trial, and seeks an award against Defendants for all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable, including but not limited to:

a.   Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b.   Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

c.   Reasonable attorney fees, interest, and costs; and,

d.   Other declaratory, equitable, and/or injunctive relief, including,

but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young student athletes and other students and vulnerable individuals, as appears to be reasonable and just.

Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorneys for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Dated: August 31, 2020          Telephone: (734) 591-4002


Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
Dated: August 31, 2020          david.shea@sadplaw.com

93

## JURY DEMAND

Plaintiff, by and through his attorneys, Michael A. Cox, Jackie Cook and The

Mike Cox Law Firm, PLLC, as well as David J. Shea, Ashley D. Shea and Shea Law

Firm PLLC, hereby demand a trial by jury on all claims set forth above.


Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorney for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Dated: August 31, 2020      Telephone: (734) 591-4002


Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Ashley D. Shea (P82471)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
Dated: August 31, 2020      david.shea@sadplaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2020, I electronically filed the foregoing document with the Clerk of the Court through the CM/ECF system, which will send notices of electronic filing to all counsel of record.

/s/ Mihaela Iosif
The Mike Cox Law Firm, PLLC
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152